IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KHANG KIEN TRAN,        (05)<br><br>Defendant. | CR. NO. 95-00151 JAO-05<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO FIRST STEP ACT AND FOR COMPASSIONATE RELEASE** |

**ORDER GRANTING DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO FIRST STEP ACT AND FOR COMPASSIONATE RELEASE**

Defendant Khang Kien Tran ("Defendant") filed a Motion to Reduce Sentence Pursuant to First Step Act and for Compassionate Release, ECF No. 759, and a Supplemental Motion to Reduce Sentence Pursuant to First Step Act and for Compassionate Release, ECF No. 767, (collectively, "the Motion"), arguing that, due to his age and current health, he faces a high risk of death or serious illness should he become infected with COVID-19.  The Court decides the Motion without a hearing pursuant to Local Rule 7.1(c).  For the following reasons, the Motion is GRANTED.

I.     BACKGROUND

A.     Procedural History

On December 10, 1998, Defendant pled guilty to Counts 2 and 5 of the

Third Superseding Indictment, ECF No. 434, which charged him with distribution

of more than 100 grams of crystal methamphetamine (Count 2) in violation of 21

U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and felon in possession of a firearm (Count

5) in violation of 18 U.S.C. § 922(g)(1).  *See* ECF Nos. 502–05.  On September 8,

2000, then-Chief District Judge David A. Ezra sentenced Defendant to an

incarceration term of 360 months as to Count 2 and 120 months as to Count 5 and

a supervised release term of five years, with the sentences for each count to run

concurrently.  ECF No. 595.  Defendant is incarcerated at Reeves I & II

Correctional Institution ("Reeves"), and is scheduled to be released on January 8,

2024.  *See* Federal Bureau of Prisons, https://www.bop.gov/inmateloc (follow

"Find By Name" tab; then search for "Khang Kien Tran") (last visited Feb. 1,

2021).

On May 12, 2020, Defendant requested compassionate release from the

warden at Reeves, which was denied the following day.  ECF No. 767-3 at 2–3.

Defendant filed the Motion pro se on October 21, 2020.[1]  ECF No. 759.  After

---

[1]  The Clerk's Office received by mail copies of the Motion and Defendant's

(continued . . .)

counsel appeared on his behalf, ECF No. 764, Defendant then filed a Supplemental

Motion on November 13, 2020.  ECF No. 767.  The Government filed a sealed

Response on December 7, 2020, *see* ECF No. 773, and a redacted version of the

same on December 11, 2020.  ECF No. 778.  Defendant filed a Reply on December

28, 2020.  ECF No. 783.  At the Court's direction, the Government filed a Status

Report Regarding the Defendant's Immigration Status on December 28, 2020.

ECF No. 784.  On January 11, 2020, Defendant filed a Second Supplement, ECF

No. 787, and the Government filed its objections on January 15, 2021, ECF No.

791.  On January 29, 2021, the United States Probation Office filed a

memorandum addressing Defendant's proposed release plan.  ECF No. 793.

> B.     Defendant's Background

> 1.     Defendant's Current Condition

Defendant, who is 60 years old, asserts that he "ha[s] pre-existing medical

conditions" putting him at "a higher risk and even death" from COVID-19 due to

the conditions at Reeves.  ECF No. 759-1 at 2.  Specifically, he avers that he

suffers from cardiomyopathy, stating the following:

---

(. . . continued)
Declaration in support on October 20, 2020 and docketed them separately.  *See*
ECF Nos. 757–58.  Defendant also mailed copies of the same, together with an
additional exhibit, to the Office of the Federal Public Defender, which then
forwarded Defendant's documents to the Clerk's Office.  *See* ECF No. 759-3.
These were filed as a single docket entry on October 21, 2020.  ECF No. 759.

> One of the main types of cardiomyopathy is arrhythmogenic which causes irregular heartbeats or rhythms.  Mr. Tran was diagnosed with arrythmia, cardiac dysrhythmia and this condition is listed as "current." (Exhibit C at Bates 004).  This is particularly concerning given what is now understood about how COVID-19 infections affect the heart and can cause long term damage.  *Mr. Tran's cardiomyopathy puts him at an increased risk for serious illness or death should he contract COVID-19.*

ECF No. 767-1 at 5–6 (footnotes omitted) (emphasis added).  However, Defendant does not identify, nor can the Court locate, where in the provided medical records it indicates that Defendant suffers from cardiomyopathy, and, without more, the Court is not convinced that a diagnosis of "[a]rrhythmia, cardiac dysrhythmia, unspecified" is the same as a cardiomyopathy diagnosis.[2]

Nevertheless, the Court acknowledges that although not discussed by either party, Defendant's medical records indicate a November 2017 diagnosis of "Atherosclerosis of native coronary, no angina," with an impression of "Nonobstructive CAD [coronary artery disease]"[3] for which Defendant was

---

[2]  Although arrythmia may be a symptom of cardiomyopathy, the CDC describes cardiomyopathy and arrhythmia as two different conditions.  *See* Am. Heart Ass'n, "Symptoms and Diagnosis of Cardiomyopathy," https://www.heart.org/en/health-topics/cardiomyopathy/symptoms-and-diagnosis-of-cardiomyopathy (last visited Feb. 1, 2021); CDC, "Other Conditions Related to Heart Disease," https://www.cdc.gov/heartdisease/other_conditions.htm  (last visited Feb. 1, 2021).

[3]  "[O]bstructive coronary disease (CAD) indicates stenosis of coronary vessel ≥50% on coronarography, while nonobstructive coronary disease (non-CAD)

(continued . . .)

prescribed "Aspirin/statin."[4]  ECF No. 790 at 104.  Defendant also has chronic

"mixed hyperlipidemia," *see* ECF No. 790 at 6, and reported during a November

2018 medical examination that he had used tobacco  ">10 pack years," but that he

quit ">20 years ago."  ECF No. 790 at 127; *see id.* at 66; *see also* ECF No. 752-1

(indicating Defendant took a "smoking cessation class" in June 2003).

Additionally, Defendant's last four blood pressure readings are suggestive of

hypertension—his most recently recorded blood pressure in December 2020 was

140/85; each of the prior three readings recorded diastolic pressures in the 80s; and

twice previously Defendant recorded systolic pressures in the 130s.  *See* Ctrs. For

Disease Control ("CDC"), "High Blood Pressure Symptoms and Causes,"

---

(. . . continued)
indicates stenosis of coronary artery <50%."  Zorin Kamarovic, et al.,
"Nonobstructive Coronary Artery Disease – Clinical Relevance, Diagnosis,
Management and Proposal of New Pathophysiological Classification,"
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6536284/ (last visited Feb. 1,
2021) (citation omitted).

[4]  In December 2017, his ASCVD ("atherosclerotic cardiovascular disease") risk
was calculated at 7.0%, which is considered "borderline risk."  ECF No. 770 at 6;
American College of Cardiology, "Key Points From the 2019 ACC/AHA
Guidelines on the Primary Prevention of Cardiovascular Disease,"
https://www.acc.org/latest-in-cardiology/articles/2019/04/29/07/42/key-points-
from-the-2019-acc-aha-guidelines-on-the-primary-prevention-of-cvd/ (last visited
Feb. 1, 2021).  In November 2018, his "CHD [coronary heart disease] Risk
Calculation" was 8%, *see* ECF No. 790 at 114, 123; in May 2020, his
"Framingham 10 yr Risk Score" was calculated at 8.6%, ECF No. 790 at 9,
suggesting that factors affecting Defendant's heart health have not improved
overall since 2017 when he was diagnosed with "Nonobstructive CAD."

https://www.cdc.gov/bloodpressure/about.htm (last visited Feb. 1, 2021) ("[Some] health care professionals diagnose patients with high blood pressure if their blood pressure is consistently 130/80 mm Hg or higher." (footnote omitted)).

Further, as candidly noted by the Government, *see* ECF No. 791, Defendant suffers from chronic hepatitis B, which is a liver disease, and has a body mass index ("BMI") of 27.5, indicating he is overweight. *See* CDC, "Hepatitis B," https://www.cdc.gov/hepatitis/hbv/index.htm (last visited Feb. 1, 2021); CDC, "Defining Adult Overweight and Obesity," https://www.cdc.gov/obesity/adult/defining.html (last visited Feb. 1, 2021) (describing a BMI of 25.0 to <30 as "overweight"). A discussion of these conditions is absent from Defendant's written submissions.

      2.      Defendant's History and Post-sentencing Behavior

Defendant's criminal activity in this matter involved 223.3 grams of "ice" and 32.43 kilograms of generic methamphetamine, and he possessed a firearm. *See* ECF No. 679-1 at 4–5. He also served as a leader of his criminal enterprise. *See id.* at 4.

Defendant's prior criminal record includes convictions for burglary in the second degree, assault with a deadly weapon, extortion, and felon in possession of a firearm. *See* ECF No. 722 at 7.

While in BOP custody, Defendant was sanctioned for nine disciplinary infractions, including two separate infractions involving fighting and two additional separate infractions involving possession of a dangerous weapon. *See* ECF No. 773-2 at 2–4. The violations he committed most recently—between 2014 and 2017—involved refusing to obey an order and unsanitariness. *See id.* His most recent serious infraction was more than eight years ago. *See id.*

Despite these violations, Defendant has exhibited an interest in rehabilitation. He has taken a wide range of classes the BOP offers, including vocational, cultural, math, and self-improvement courses. *See* ECF Nos. 767-6; 783-2.

C.      Conditions at Reeves

As of this writing, Reeves reports it has 1 active COVID-19 case among inmates and none among staff. *See* Federal Bureau of Prisons, https://www.bop.gov/coronavirus (click on "Full breakdown and additional details" then on "privately-managed prisons") (last visited Feb. 1, 2021). It further details that a total of 17 inmates have recovered from COVID-19, and that it presently has a population of 1,500 inmates. *See id.*; Federal Bureau of Prisons, https://www.bop.gov/locations/ci/ree/ (last visited Feb. 1, 2021).

II.    DISCUSSION

A.    The First Step Act

Prior to the passage of the First Step Act of 2018, Pub. L. No. 115-391, 132

Stat. 5194 ("First Step Act"), only the BOP could move for an inmate's

compassionate release.  *See* 18 U.S.C. § 3582(c)(1)(A) (2012).  But the First Step

Act amended, among other things, 18 U.S.C. § 3582(c)(1)(A), which now allows

inmates to seek compassionate release:

> [T]he court, upon motion of the Director of the Bureau of
> Prisons, or upon motion of the defendant after the defendant has
> fully exhausted all administrative rights to appeal a failure of the
> Bureau of Prisons to bring a motion on the defendant's behalf or
> the lapse of 30 days from the receipt of such a request by the
> warden of the defendant's facility, whichever is earlier, may
> reduce the term of imprisonment (and may impose a term of
> probation or supervised release with or without conditions that
> does not exceed the unserved portion of the original term of
> imprisonment), after considering the factors set forth in section
> 3553(a) to the extent that they are applicable, if it finds that –
>
> (i)    extraordinary and compelling reasons warrant such
>        a reduction; . . .
>        *and that such a reduction is consistent with*
>        *applicable policy statements issued by the*
>        *Sentencing Commission*[.]

18 U.S.C. § 3582(c)(1)(A) (2018) (emphasis added).

United States Sentencing Guidelines ("USSG") section 1B1.13 ("the

Guideline") addresses Section 3582 motions, but the Sentencing Commission has

not updated the Guideline since the passage of the First Step Act.[5]  The Guideline

allows for a sentence reduction for compassionate release "[u]pon motion of the

Director of the Bureau of Prisons . . . if, after considering the factors set forth in 18

U.S.C. § 3553(a), to the extent that they are applicable, the court determines that . .

. extraordinary and compelling reasons warrant the reduction[.]"  USSG § 1B1.13.

It further outlines four categories of extraordinary and compelling reasons in the

application notes:  the defendant's medical condition, the defendant's age (at least

65 years old), family circumstances, and "other reasons." *Id.*, comment. (n.1).

This last category is known as the "catch-all" clause.  *United States v. Brooker*,

976 F.3d 228, 232 (2d Cir. 2020).  The Guideline notes also explain that the catch-

all clause applies when, "[a]s determined by the Director of the Bureau of Prisons,

there exists in the defendant's case an extraordinary and compelling reason other

than, or in combination with, the [other] reasons[.]"  USSG § 1B1.13, comment.

(n.1).  In other words, according to the Guideline, wide discretion regarding what

constitutes an "extraordinary and compelling reason" rests only with the BOP

Director.

---

[5]  The Commission's failure to amend the Guideline is likely due to its lack of sufficient members for a quorum.  *See* U.S. Sentencing Commission, "About the Commissioners," https://www.ussc.gov/commissioners (last visited Feb. 1, 2021) (listing only 1 voting commissioner); U.S. Sentencing Commission, "Organization," https://www.ussc.gov/about/who-we-are/organization (last visited Feb. 1, 2021) ("The affirmative vote of at least four members of the Commission is required to promulgate amendments to the sentencing guidelines.").

The change in the compassionate release statute and lack of amendment to the Guideline beg the question of whether the Guideline applies to *all* Section 3582 motions—including those brought by defendants.  The Court concludes that it does not.

The plain language of the Guideline clearly limits the Guideline's application to compassionate release motions filed by the BOP Director.  *See United States v. Cruz-Gramajo*, 570 F.3d 1162, 1167 (9th Cir. 2009) (explaining that the rules of statutory construction apply to the Guidelines and that plain language controls); USSG § 1B1.13 ("Upon motion of the Director . . . .").  And this plain reading now has support from four Circuits and numerous district courts within the Ninth Circuit.  *See Brooker*, 976 F.3d at 235 ("Turning to the text of the Guideline § 1B1.13, it is manifest that its language is clearly outdated and cannot be fully applicable.  The very first words of the Guideline are '[u]pon motion of the Director of the Bureau of Prisons.'" (alteration in original and citation omitted)); *see United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *8 (6th Cir. Nov. 20, 2020) ("Examining the four corners of § 1B1.13 alone, it becomes immediately apparent that the policy statement does not wholly survive the First Step Act's promulgation.  The first sentence of § 1B1.13 predicates the entire policy statement on the Director of BOP's filing a motion for compassionate release." (citation omitted)); *United States v. McCoy*, Nos. 20-6821, 20-6869, 20-

6875, 20-6877, 2020 WL 7050097, at *7 (4th Cir. Dec. 2, 2020); *United States v. Gunn*, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020) ("Section 1B1.13 addresses motions and determinations of the Director, not motions by prisoners.  In other words, the Sentencing Commission has not yet issued a policy statement 'applicable' to Gunn's request.  And because the Guidelines Manual lacks an applicable policy statement, the trailing paragraph of § 3582(c)(1)(A) does not curtail a district judge's discretion.  Any decision is 'consistent with' a nonexistent policy statement."); *see also, e.g.*, *United States v. Parker*, 461 F. Supp. 3d 966, 978–79 (C.D. Cal. 2020) (collecting cases and rejecting the argument "that pre-[First Step Act] categories contained in U.S.S.C. § 1B1.13 limit [a court's] discretion to determine whether an inmate has raised 'extraordinary and compelling' circumstances that justify the modification of her sentence." (quoting *United States v. Wade*, No. 2:99-cr-00257-CAS-3, 2020 WL 1864906, at *5 (C.D. Cal. Apr. 13, 2020)); *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681–82 (N.D. Cal. 2019) (collecting cases); *United States v. Manzo*, Nos. 2:07-CR-02042-LRS-2, 2:07-CR-02071-LRS-1, 2020 WL 6786898, at *2 (E.D. Wash. Nov. 18, 2020); *United States v. Hernandez*, CR. NO. 13-00511(1) JMS, 2020 WL 3453839, at *4 (D. Haw. June 24, 2020) (collecting cases).

The plain language of the statute itself does not alter this conclusion.  The First Step Act directs the Court to evaluate whether "a reduction is consistent with

*applicable* policy statements issued by the Sentencing Commission." 18 U.S.C. §

3582(c)(1)(A) (emphasis added). Because the Guideline does not apply here, the

Court is not restricted by it or its notes and relies on the direction outlined in the

statute. *See McCoy*, 2020 WL 7050097, at \*7 ("What § 3582(c)(1)(A) requires is

that sentence reductions be consistent with 'applicable policy statements.' And

here, that consistency requirement simply is not implicated, for the threshold

reason that there currently exists no 'applicable policy statement.'" (brackets

omitted)).

Even if the Court were to look past the plain language of both the statute and

the Guideline, it is undisputed that the First Step Act was passed in an effort to

reduce incarceration, *see generally* 164 Cong. Rec. S7640–50 (daily ed. Dec. 17,

2018); *see also* Congressional Research Service, *The First Step Act of 2018: An

Overview* (Mar. 4, 2019), https://crsreports.congress.gov/product/pdf/R/R45558,

and that Congress amended Section 3582 in response to the BOP's underwhelming

number of compassionate release motions. *See* First Step Act § 603(b), 132 Stat. at

5239 (titled "Increasing the Use and Transparency of Compassionate Release");

*see also Brooker*, 976 F.3d at 233. Therefore, concluding that the Guideline

applies only to motions brought by BOP does not undermine the intent of the

passage of the First Step Act and in particular the amendments made to the

compassionate release statute. *See Jones*, 2020 WL 6817488, at \*8 ("It would

12

make little sense for the courts to operate as if the BOP remains the sole gatekeeper of compassionate release, which would reflect a bygone era that Congress intentionally amended in the First Step Act.").

Unfettered by USSG § 1B1.13, the Court follows Section 3582(c)(1)(A)'s direction.

B.      Whether Extraordinary and Compelling Reasons Exist Here[6]

The question before the Court is not the same question addressed at sentencing.  The Court is not asked to determine whether the sentence previously imposed was "sufficient, but not greater than necessary" to comply with the factors outlined in 18 U.S.C. § 3553(a)(2), but rather, to determine whether "extraordinary and compelling reasons warrant . . . a reduction." 18 U.S.C. § 3582(c)(1).  If the answer to that question is yes, then the Court is required to evaluate the Section 3553(a) factors to decide whether to reduce the incarceration term.  *See* 18 U.S.C. § 3582(c)(1)(A).

1.      Defendant's Health

Through defense counsel, Defendant purports to have two risk factors:  age and cardiomyopathy.  Additionally, because Defendant's initial pro se motion generally referred to "pre-existing medical conditions" and a review of submitted

---

[6]  The Court finds—and it is undisputed—that Defendant has met the administrative requirements for filing the Motion.

medical records reveals additional risk factors such as coronary artery disease, prior smoking history, hypertension, and—as noted by the Government—chronic hepatitis B and being overweight, the Court includes these additional factors in its review, as "'a district court's discretion in this area [of compassionate release]—as in all sentencing matters—is broad.'" *Brooker*, 976 F.3d at 237 (quoting *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc)); *accord, e.g.*, *United States v. Bass*, 462 F. Supp. 3d 176, 185 (N.D.N.Y. 2020) (conducting an "independent review of [the defendant's] health conditions reported in the [pre-sentence investigation report]" when the defendant's medical records were unavailable to the Court); *United States v. Mitchell*, No. 3:16-cr-57-J-32PDB, 2020 WL 7138622, at *1 (M.D. Fla. Dec. 7, 2020) (conducting an "independent review" of the defendant's medical records when, even after "[t]he Court appointed counsel to file a supplemental motion on [the defendant's] behalf," the defendant "fail[ed] to cite where in the 238 pages of attached medical records the Court c[ould] find support for [his] assertions" (citation omitted)).

        a.     Age

Based on age alone, Defendant has an approximately four-fold greater risk of hospitalization and a 30-fold greater risk of death should he contract COVID-19 in comparison to an individual between 18 and 29 years of age. *See* CDC, "Older Adults," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/

older-adults.html (last visited Feb. 1, 2021).  However, he does not fall into the age group (65 and older) where death is most likely.  *See id.* (reporting that 80 percent of COVID-19 deaths in the United States have been in those 65 and older; also reporting that the risk of death for those 65–74 is 90 times higher than those between 18 and 29, and that the risk increases exponentially for those older than 74).

     b.  Cardiomyopathy

   The Court concludes that Defendant has not offered a sufficient basis to find that he in fact suffers from cardiomyopathy.  There is nothing in his medical records that states as much, and while he suffers from arrhythmia and dysrhythmia, the Court's understanding is that such diagnoses are not the equivalent of cardiomyopathy.

     c.  Other Pre-existing Medical Conditions:  Coronary Artery Disease, Prior Smoking History, Hypertension, Chronic Hepatitis B, and Being Overweight

   Defendant's medical records, which the Government had an opportunity to review and address, show that he suffers from at least two conditions that place him at increased risk of severe illness if he were to contract COVID-19:  coronary artery disease and a lengthy history of smoking despite having quit some time ago. *See* CDC, "People with Certain Medical Conditions," https://www.cdc.gov/

coronavirus/2019-ncov/need-extra-precautions%2Fgroups-at-higher-risk.html (last visited Feb. 1, 2021). Although the medical records do not indicate if Defendant's coronary artery disease has since resolved,[7] the Court observes that an evaluation of Defendant's heart disease risk factors does not show improvement. *See supra* note 4.

Defendant's BMI (27.5), chronic hepatis B, and arguable hypertension are also conditions for which he "might be at an increased risk for severe illness." *Id.* (emphasis omitted). The Court acknowledges that, in combination, Defendant's health conditions make him more vulnerable to serious complications from COVID-19 than a healthy person.

### 2.     Conditions at Reeves

The Court observes that, as of January 15, 2021, more than half of the private prison facilities that contract with the BOP reported zero active COVID-19 cases among inmates. *See* Federal Bureau of Prisons, https://www.bop.gov/coronavirus (click on "Full breakdown and additional details" then on "privately-managed prisons") (accessed on Jan. 15, 2021). Current statistics continue to show that nearly half of the facilities report zero or only 1 active case among inmates. *See id.* (last visited Feb. 1, 2021). Defendant reports—and the medical records

---

[7] This is distinct from any indication that Defendant's "chest pain, unspecified" had resolved. *See* ECF No. 778 at 7.

corroborate—that he has not yet received a COVID-19 test at Reeves during the entire duration of the pandemic, despite the fact that he fell ill with COVID-19 symptoms in August.  ECF No. 759-1 at 2.  Having now reviewed a number of other inmates' medical records for purposes of addressing their compassionate release motions, the Court is concerned that Defendant has yet to receive a COVID-19 test, particularly because Reeves has had some COVID-19 positive cases, *see* Federal Bureau of Prisons, https://www.bop.gov/coronavirus (click on "Full breakdown and additional details" then on "privately-managed prisons") (last visited Feb. 1, 2021) (reporting 17 inmates recovered), and it is unclear whether the low numbers at Reeves is due to limited testing.  Notably, Reeves is located in Reeves County, Texas, which has had a total of 1,576 confirmed COVID-19 cases, *see* https://www.arcgis.com/apps/MapSeries/index.html?appid=ad46e587a9134fcd b43ff54c16f8c39b (mouse over Reeves County) (last visited Feb. 1, 2021), amongst a population of under 14,000, *see* United States Census Bureau, "QuickFacts, Reeves County, Texas," https://www.census.gov/quickfacts/ reevescountytexas (last visited Feb. 1, 2021), suggesting an infection rate of over 10% in the community surrounding Reeves.  The most recently reported two-week positivity rate is 11%, which corresponds to an "extremely high risk level" of getting COVID-19.  *See* N.Y. Times, "Tracking Coronavirus in Reeves County,

Texas," https://www.nytimes.com/interactive/2021/us/reeves-texas-covid-cases.html (last visited Feb. 1, 2021).

Defendant contends that "[a]bsent widespread testing and verification, along with appropriate PPE, and physical distancing, there are no assurances that [Reeves] would be able to contain the spread of the virus."  ECF No. 767-1 at 9. The Court agrees.

Defendant has provided detailed descriptions of his living conditions at Reeves, *see, e.g.*, ECF Nos. 759-2, 787-1, explaining, among other things, that:  the prison is overcrowded with insufficient space for inmates' social distancing; prisoners have not been provided any masks; there is a lack of COVID-19 testing for inmates; and "prison staff does not show any concern about social distancing," presumably amongst each other.  ECF No. 787-1 at 8.  The Government has not responded to these characterizations and the Court therefore does not have a basis upon which to doubt them.

The Government urges the Court to conclude that there cannot be extraordinary and compelling reasons to release Defendant because the BOP has started to vaccinate its prisoners.  However, based on the Government's own statistics, less than five percent of the total inmate population has received any of the vaccine.  *See* ECF No. 791 at 6 (reporting a total of approximately 6,500 inmates have received either the first or both doses of the vaccine); Federal Bureau

of Prisons, https://www.bop.gov/about/facilities/ (last visited Feb. 1, 2021) (reporting a total federal inmate population of 152,071).

Based on the foregoing reasons, the Court concludes that Defendant has demonstrated there are extraordinary and compelling reasons to consider a sentence reduction.  Defendant's health conditions in combination make him more vulnerable to serious complications from COVID-19 than a healthy person, and he has persuaded the Court that the conditions at Reeves—particularly its failure to administer a COVID-19 test to him when he demonstrated symptoms of the disease—reveal a possible complacency regarding the prevention, management, and treatment of COVID-19 to warrant such a conclusion.

The Court thus turns to the Section 3553(a) factors to determine what reduction or modification, if any, is warranted.

3.    Section 3553(a) Factors

*The nature and circumstances of the offense and the history and characteristics of the defendant*

Defendant was the leader of a conspiracy that trafficked more than 30 kilograms of methamphetamine.  It is impossible to quantify methamphetamine's devastation in the islands.  Perhaps more than any other drug, it has severely (and in many cases permanently) damaged our families and communities.  He also pleaded guilty to possessing a firearm after having been convicted of a felony, and that firearm surely emboldened his drug trafficking in this case.

19

Defendant does indeed have a significant and concerning criminal history, but he has been incarcerated on this matter since he was in his mid-30s and is now a 60-year-old man.  And while he has had recent BOP violations, his most serious violations are eight years old or older, suggesting that, with time, he has become less inclined to engage in dangerous activities.

> *The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense*

A thirty-year sentence is a long one for a non-violent drug conviction. Defendant has now served all but four years of that sentence.  The Court cannot conclude that reducing the sentence by four years would undermine the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and providing just punishment.

> *The need to afford deterrence to criminal conduct and to protect the public from further crimes of defendant*

As stated, Defendant is now a much older man than he was when he committed the crimes here.  He has spent most of his adult life incarcerated and knows the realities and difficulties of incarceration.  He will be under federal supervision upon his release and reunited with family with whom he has not lived in decades.  There is little, if any, incentive for him to reoffend under these circumstances.

*The need to avoid unwarranted sentencing disparities*

Defendant's sentence of 360 months was three times longer than the next-highest sentence of any of his codefendants.  He deserved a longer sentence and got one; reducing the term by approximately four years will not result in an unwarranted sentencing disparity.

C.      Whether Defendant Has a Viable Release Plan

The Court has reviewed the United States Probation Office's memorandum regarding Defendant's proposed release plan and finds that it is suitable to assist in monitoring his compliance with the conditions of supervised release.[8]

//

//

//

//

//

//

//

//

---

[8]  The Court expects that Defendant will be transferred into immigration custody immediately upon his release.  *See* ECF No. 784.  Because Immigration and Customs Enforcement will likely release him shortly thereafter, *see id.*, the immigration detainer does not affect the Court's analysis of his proposed release plan.

III.    CONCLUSION

For the foregoing reasons, the Motion, ECF Nos. 759, 767, is GRANTED.

It is FURTHER ORDERED that:

1.      Defendant's sentence of incarceration is reduced to time served.

2.      Upon his release from custody, Defendant shall commence serving his 5-year term of supervised release as to Count 2 and 3-year term of supervised release as to Count 5, as previously imposed; and shall abide by all mandatory, standard, and special conditions as approved and ordered by the Court on September 8, 2000 and filed on September 14, 2000.  *See* ECF No. 595.  In addition, Defendant must abide by the following additional special conditions:

> 4. You must submit your person, property, house, residence, vehicle, papers, or office, to a search conducted by a U.S. Probation Officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

> 5. You must participate for a period of 180 days in a home confinement program which may include electronic monitoring, GPS, or automated identification technology and shall observe all rules of such program, as directed by the probation officer. You are always restricted to your residence except for employment; education; religious services; medical treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by the probation officer. You shall pay the costs of monitoring to the contract

22

vendor, not to exceed the sum of $12.00 for each day of participation. You shall provide proof of payment as directed by the probation officer.

6.   Should you be released from the custody of U.S. Immigration and Customs Enforcement (ICE) pending deportation proceedings, you are ordered to report within 72 hours by telephone (949-527-5312) to U.S. Probation Officer Meredith Edwards of the U.S. Probation Office, Central District of California, and follow the officer's instructions.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, February 1, 2021.



_____

Jill A. Otake
United States District Judge

Cr. No. 95-000151 JAO-05, *United States v. Khang Kien Tran*; ORDER GRANTING DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO FIRST STEP ACT AND FOR COMPASSIONATE RELEASE